## AFFIDAVIT OF GLEN C. COLETTI

I, Glen C. Coletti, being duly sworn, state under oath as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I have been a Special Agent with the Drug Enforcement Administration (DEA) since 1997. Most recently, I have been assigned to Task Force 4 – Cross Borders Initiative (CBI) of the DEA's Boston Division since 2003. As such, I am an "investigative or law enforcement officer of the United States" within the meaning of Title 18, United States Code, Section 2510(7), that is an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2. In October 1997, I attended, and graduated from, the DEA's seventeen-week Basic Agent academy in Quantico, Virginia. Upon completion of that academy, I was assigned to the Baltimore District Office, Baltimore, Maryland, where I performed investigative duties in the field of narcotics enforcement for approximately three years. In 2001, I was transferred to the Boston Field Division and assigned to the Manchester Resident Office, Manchester, New Hampshire. In October 2003, I was reassigned to DEA Boston's - Task Force 4/CBI in North Andover, Massachusetts.

3. During the course of my employment with the DEA, I have received specialized training regarding the activities of illegal drug traffickers and various aspects of controlled substances investigation, including the methods used to package, transport, store, and distribute controlled substances, and the methods used by drug traffickers to conceal and launder the proceeds of their illegal drug trafficking activities. I also have a Bachelor of Science degree in Criminal Justice from Northeastern University.

4. In addition to my training, I have had extensive experience in the investigation of the activities of illegal drug traffickers. Since joining the DEA, I have participated in hundreds of controlled substances investigations as a case agent and in subsidiary roles relating to the distribution of controlled substances, including fentanyl, cocaine, cocaine base, heroin, marijuana, methamphetamine, and other illegal substances. I have personally participated in almost all aspects of drug trafficking investigations, including but not limited to, conducting surveillance, acting in undercover capacities, using confidential informants, executing arrest and search and seizure warrants, and conducting court-authorized wire and electronic surveillance. I have debriefed numerous defendants, informants, and witnesses who had personal knowledge about drug trafficking activities and the operation of drug trafficking organizations. I have sworn out numerous affidavits in support of search warrants, arrest warrants, and other court applications.

5. Based upon my training and experience, I am familiar with the manner in which narcotics traffickers use telephones, coded, veiled, or slang-filled telephone conversations, electronic text-messages, pagers, coded pager messages, and other means to facilitate their illegal activities. I am familiar with the vernacular, i.e., the "street" language, used by drug traffickers, as well as the methods they use to disguise conversations and operations. I am also familiar with the common appearance, packaging, and texture of the narcotics listed above.

6. I am submitting this affidavit in support of:

> a. An application for a criminal complaint charging DARIO BIER ROMERO (hereinafter, "ROMERO") with conspiracy to distribute and to possess with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§846, 841(a)(1), and 841(b)(1)(A)(vi); and

      b.      An application for a criminal complaint charging LUIS CIRINO (hereinafter, "CIRINO") with conspiracy to distribute and to possess with intent to distribute 400 grams or more of a mixture and substance containing N-phenyl-N- [ 1- ( 2-phenylethyl ) -4-piperidinyl ] propanamide, also known as fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§846, 841(a)(1), and 841(b)(1)(A)(vi).

      7.      As will be explained more fully below, DEA investigators believe that, beginning no later than June 15, 2018, ROMERO and CIRINO conspired together to sell and did sell one hundred grams of fentanyl to an undercover agent and a confidential source and that, on June 21, 2018, ROMERO and CIRINO conspired together to sell three kilograms of fentanyl and delivered three kilograms of fentanyl to a confidential source.

      8.      I have personally participated in the investigation of ROMERO and CIRINO as outlined in this affidavit. I am familiar with the facts and circumstances of this investigation based upon: (a) my personal knowledge and involvement in this investigation; (b) my review of records related to this investigation; (c) information provided to me orally and in writing by other law enforcement agents; and (d) my experience and training as a criminal investigator.

      9.      Because this affidavit is submitted for the limited purpose of establishing probable cause to believe that ROMERO and CIRINO engaged in a conspiracy to possess with intent to distribute and to distribute fentanyl in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi), I have not included each and every fact known to me or other law enforcement officers involved in this investigation. Rather, I have included only those facts that I believe are necessary to establish probable cause for the issuance of the requested criminal complaint. Facts not set forth herein are not being relied upon in reaching my conclusion that there is probable cause to support the issuance of the requested complaint. Nor do I request that this Court rely on any facts not set forth herein in reviewing these applications. All times contained herein are approximate.

## PROBABLE CAUSE

### A.   CIRINO negotiated the sale of suspected fentanyl on June 14, 2018

10.   In June 2018, a DEA confidential source (hereinafter, "CS1") reported to investigators that CS1 met CIRINO and learned that he was a fentanyl distributor in the Lawrence, Massachusetts, area.  DEA investigators have corroborated the information provided by CS1 to the extent possible and have found CS1 to be truthful. CS1 has provided information based on CS1's personal observations, conversations, and interaction he/she has had with CIRINO. CS1 has provided information in the past that has led to the arrest of individuals for controlled substances violations. CS1 is working for monetary gain. CS1 has a criminal history that includes a controlled substance violation.

11.   At the direction of DEA investigators, in June 2018, CS1 had phone conversations with CIRINO by calling CIRINO's phone number (978) 327-0672. According to CS1, during several telephone conversations, CS1 and CIRINO discussed the purchase price and sale of fentanyl. Thereafter, CS1 and CIRINO agreed to meet in person on June 14, 2018. These phone calls were not monitored, but CS1 reported that he/she recorded the telephone calls.

12.   On June 14, 2018, DEA investigators equipped CS1 with an audio recording and wireless monitoring device. After being equipped with the audio recording device, investigators followed CS1 to a Panera Bread restaurant in Woburn, Massachusetts, where CS1 and CIRINO had arranged to meet during a prior telephone conversation. While under DEA visual and audio surveillance, CS1 and CIRINO met at the outdoor seating area of the restaurant and negotiated the sale of one hundred grams of "China white" for $6,100 and discussed the pricing of one kilogram of "China white" set at $60,000. CIRINO referenced that his "China white" was as "white as that plate," pointing to a white plate at the restaurant. Based upon my training and

experience, "China white" is a street name for fentanyl. Further based upon my training and experience, this is consistent with the price of fentanyl in the Eastern Massachusetts area. This conversation, as well as all other conversations between CS1 and CIRINO, was in Spanish. A Spanish-speaking DEA investigator monitored this conversation and interpreted the conversation in real-time for other investigators. After the meeting, investigators met with CS1 to retrieve the audio recording device and preserved the recording.

### B. CIRINO brokered the sale of suspected fentanyl between CS1 and ROMERO on June 15, 2018

13. On June 15, 2018, at approximately 8:00 a.m., Providence (RI) Police Detective Andre Perez established surveillance of 491 Plainfield Street, Providence, Rhode Island. This address was previously identified in a prior investigation as the residence of ROMERO. At approximately 8:30 a.m. Detective Perez observed a 1999 Toyota Sienna minivan with Rhode Island registration XF346, which is registered to ROMERO, in the driveway of 491 Plainfield Street. Both ROMERO's vehicle registration and his driver's license indicate that he lives at 491 Plainfield Street, Apartment #2, Providence, Rhode Island. Detective Perez then saw ROMERO enter the minivan carrying a small, black, plastic bag. Detective Perez maintained surveillance of the minivan as it traveled onto Route 10 in Providence. Detective Perez lost visual contact with the minivan as it approached Route 95 Northbound.

14. Later in the day on June 15, 2018, CIRINO arranged by telephone to meet CS1 at the Burlington Mall in Burlington, Massachusetts, to sell one hundred grams of fentanyl for $6,100, as previously negotiated. The call was monitored and recorded. Prior to the arranged meeting, CS1 was searched for any contraband or money with negative results. Thereafter, CS1 was equipped with an audio and video recording device. A Spanish-speaking, undercover DEA

task force agent (hereinafter, the "UC") accompanied CS1 to the controlled purchase and drove CS1 in an undercover police vehicle to meet CIRINO at the Burlington Mall. The undercover police vehicle was equipped with a secret compartment operated by an electronic trigger. The UC placed $6,100 of previously recorded official government funds, wrapped in plastic bags, into the secret compartment prior to driving to the Burlington Mall.

15. CS1 and the UC arrived at the Burlington Mall at approximately 12:30 p.m., where the UC dropped off CS1 near the Cheesecake Factory Restaurant. At approximately 12:40 p.m., DEA investigators located ROMERO's Toyota Sienna minivan near the Macy's Department Store at the Burlington Mall. Simultaneously, during a telephone conversation, CIRINO told CS1 that he was inside the Macy's and would be at the Cheesecake Factory shortly. Only CS1's end of the telephone conversation was recorded by the audio recording device. At approximately 12:47 p.m., investigators observed CIRINO and ROMERO exit the Macy's and enter ROMERO's minivan. The two men then drove from the front of Macy's to the parking lot in front of Cheesecake Factory.

16. At approximately 12:50 p.m., investigators observed CIRINO leave the minivan and enter the Cheesecake Factory alone. Once inside the Cheesecake Factory, CIRINO met with CS1. The meeting was recorded and surveilled by investigators. After the two met, CS1 called the UC and instructed him to bring the $6,100 to them. Only CS1's end of the telephone conversation was recorded by the audio recording device. The UC then drove to CS1 and UC outside the Cheesecake Factory and they entered the vehicle.

17. At approximately 12:54 p.m., CS1 entered the rear driver's side seat of the UC's vehicle and CIRINO entered the rear passenger side seat. One inside the vehicle, CS1 introduced the UC to CIRINO. After the introduction, the UC remotely opened the secret compartment,

revealing the $6,100 of U.S. Currency to CIRINO and CS1. After the secret compartment was opened, CIRINO took the money wrapped in plastic bags, opened the plastic bags, and began counting the money. CIRINO did not finish counting the money and said that he would count the money later. CIRINO then took out a black, plastic bag from his pocket and handed it to CS1. The UC then instructed CS1 to place the black, plastic bag into the secret compartment. After CS1 placed the black, plastic bag into the secret compartment, the UC remotely closed the secret compartment. The dark plastic bag was later inspected by DEA investigators and found to contain approximately one hundred grams of a compressed white powder, which based upon my training and experience and the facts in this investigation I believe to be fentanyl. CIRINO then instructed the UC to drive around the parking lot. During the drive around the parking lot, CIRINO and CS1 discussed a deal for three kilograms of fentanyl. The UC was present for this negotiation, which was recorded. CIRINO mentioned that he did not want to do the three kilogram deal in a parking lot, but preferred to do that deal in a house. CS1 suggested doing the deal for three kilograms of fentanyl in a hotel room, at which time CIRINO told CS1 to call him when CS1 was ready to do the deal. CIRINO then instructed the UC to stop the vehicle, at which time CIRINO left the UC's vehicle.

18.     At approximately 12:58 p.m., an investigator conducting surveillance observed CIRINO enter ROMERO's minivan, now parked in front of the Nordstrom Department Store at the Burlington Mall. The approximately one hundred grams of suspected fentanyl was not field tested due the airborne hazards of fentanyl and concerns for officer safety. The one hundred grams of suspected fentanyl was secured in the DEA-CBI drug vault and will be transported to the Northeast Regional Laboratory for further analysis.

19. Investigators maintained surveillance of ROMERO's minivan after CIRINO entered the minivan and observed the minivan drive directly to Route 3 Northbound. At approximately 1:37 p.m., investigators observed the minivan park in front of 26 Bromfield Street, Lawrence, Massachusetts, which is the residence of CIRINO. Once stopped at that address, investigators observed CIRINO exit the passenger seat of the minivan and enter another vehicle with a Massachusetts registration, and then depart the area. Investigators discontinued surveillance of CIRINO and maintained surveillance on ROMERO's minivan.

20. After dropping off CIRINO at 26 Bromfield Street, ROMERO was the sole occupant of his minivan and sat idly in his minivan for several minutes. At approximately 1:41 p.m., ROMERO drove to a McDonald's Restaurant in Methuen and went into the restaurant. An investigator followed ROMERO into the McDonald's restaurant and confirmed his identity by comparing him to his Rhode Island driver's license image, which was obtained earlier in the day. It should be noted that ROMERO has a distinct scar on his face.

21. At approximately 2:00 p.m., ROMERO left the McDonald's with food and ate in his minivan. A short time later, ROMERO began heading southbound on Route 93 and then Route 495. Once on Route 495 Southbound, I contacted Providence Police Detective Perez and advised him of my observations and investigation. Detective Perez then re-established surveillance of 491 Plainfield Street in Providence. At approximately 3:55 p.m., Detective Perez advised me that he observed ROMERO arrive at 491 Plainfield Street wearing the same clothing he was wearing earlier in the day, and enter the rear of 491 Plainfield Street on the right side of the driveway.

### C. **Seizure of three kilograms of suspected fentanyl from CIRINO and ROMERO on June 21, 2018**

22. On June 21, 2018, under the direction and control of DEA investigators, CS1 made a consensually-recorded telephone call to CIRINO at telephone number (978) 327-0672. The purpose of the call was for CS1 to tell CIRINO that he was ready to purchase the three kilograms of fentanyl at the negotiated price of $60,000 per kilogram, for a total purchase price of $180,000, as discussed on June 14th and June 15th.

23. On June 21, 2018 at approximately 6:00 a.m., investigators established surveillance of 491 Plainfield Street in Providence. At approximately 10:44 a.m., investigators observed ROMERO exit the rear of 491 Plainfield Street carrying a blue-colored duffle bag. Surveillance investigators observed ROMERO then enter his Toyota Sienna with that bag. Surveillance investigators followed ROMERO from his residence in Providence directly to the Red Roof Plus located at 16 Commerce Way, Woburn, Massachusetts.

24. Later on June 21, 2018, CS1 called CIRINO at (978) 327-0672 and directed him the Red Roof Plus hotel in Woburn, Massachusetts to complete the three-kilogram sale. This call was consensually recorded. Prior to CS1 calling CIRINO, investigators equipped the hotel room with audio and video surveillance equipment. This equipment was monitored and recorded by investigators. Prior to arriving at the Red Roof Plus hotel room, CS1 was searched for contraband with negative results. CS1 was followed by investigators into the hotel room where they allowed CS1 to wait there for CIRINO. CS1 was outfitted with a transmitting and recording device that was monitored by investigators. The recording is preserved.

25. At approximately 11:24 a.m., CIRINO arrived at the Red Roof Plus and called CS1. CS1 directed CIRINO to meet in the hotel lobby. Shortly thereafter, surveillance agents observed CIRINO and CS1 meet in the hotel lobby. During the lobby meeting, which was monitored by investigators and recorded, CIRINO advised CS1 that they needed to be cautious

with the first big deal and that subsequent deals would be much smoother. This conversation was in Spanish and a Spanish-speaking investigator was monitoring the conversation and interpreting the conversation for other investigators. CIRINO told CS1 that only he and his guy would come to the room upstairs. CIRINO told CS1 that he has been dealing with his guy for two years and has known him for approximately six years. CIRINO advised CS1 that he has been in Massachusetts for approximately nine years. CIRINO told the CS1 that he has been working in selling drugs for the past eight years in Massachusetts. CIRINO told CS1 that he does not deal with people from Lawrence or Bani (meaning Bani, Dominican Republic). CIRINO told CS1 that he was in a small problem with the "Mexicans" last year and that he owed them almost $600,000. CIRINO told CS1 that he was eventually able to pay the "Mexicans" their money. CIRINO told CS1 that if CS1 wanted pills he could provide CS1 with pills and that they were made to look like "Perc 30" (meaning, Percocet 30 milligram pills). CIRINO told CS1 that the pills were not original and that he could color the pills any color CS1 wanted and charges six dollars per pill. Based on the investigation, investigators believe that CIRINO was referring to fentanyl pills. CIRINO told CS1 that he brought crystal meth pills from Pennsylvania to Massachusetts last year and nobody liked them. CIRINO received an incoming phone call and advised CS1 that his guy would be there shortly. CS1 told CIRINO that he was up on the fourth floor of the hotel and to call him when CIRINO was inside the hotel with his guy. CS1 told CIRINO that CS1 would then tell CIRINO which room number to go to when CIRINO was back inside the hotel. CS1 then returned to the hotel room. Shortly thereafter, CS1 was contacted by CIRINO. CIRINO told CS1 that he was inside with his guy and the product. CS1 then provided room number 435 to CIRINO.

26.     At approximately 12:20 p.m., surveillance officers observed CIRINO and ROMERO arrive at room 435.  According to CS1, and based on electronic surveillance, ROMERO placed a blue-colored duffle bag on the table.  CIRINO removed a one kilogram package from the duffle bag.  ROMERO told CS1 to test the kilogram.  CS1 told ROMERO and CIRINO that CS1 did not have a blade or a key and told them that CS1 would get one from his guy.  At that time, CS1 began to walk to the room entry door.  Members of the arrest team were ready to make entry into the room.  Upon CS1 opening the door, the arrest team entered the room and secured ROMERO, CIRINO and the three kilograms of suspected fentanyl.  After later inspection, I believe the package delivered by CIRINO and ROMERO to be fentanyl based upon my training and experience, the appearance and packaging of the substance, the negotiated purchase price, and the background facts of this investigation.

27.     At approximately 12:40 p.m., Providence Police Officers and DEA investigators executed a Rhode Island state authorized search warrant at 491 Plainfield Street, Apartment #2 in Providence. During the execution of the search warrant, investigators seized approximately one kilogram of white powdery substance believed to be fentanyl from the apartment. Investigators believe the one kilogram of white powdery substance is fentanyl based upon their training and experience, observations about the packaging, and appearance of the substance. In addition, investigators seized numerous items consistent with items used to package and process drugs for distribution as well other drug paraphernalia items.   Arrested inside the apartment was the brother of ROMERO, identified as Abel Bier Romero (Year of birth: 1993).  Abel Bier Romero was subsequently booked and charged with Conspiracy and Possession with Intent to Distribute Fentanyl in the State of Rhode Island.

## **CONCLUSION**

28. Based upon the evidence set forth above, as well as my training and experience, I submit that there is probable cause to believe that beginning no later than June 13, 2018 and continuing to June 21, 2018, Dario Bier ROMERO and Luis CIRINO conspired to distribute and to possess with intent to distribute 400 grams or more of fentanyl, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi). Accordingly, I respectfully request that a criminal complaint charging ROMERO and CIRINO with violations of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A)(vi) be issued.

_____
Glen C. Coletti
Special Agent
Drug Enforcement Administration

SIGNED and SWORN to before me this 22nd day of June, 2018.

_____
HONORABLE DONALD L. CABELL
United States Magistrate Judge
District of Massachusetts